**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Southern Division

|  |  |  |
|---|---|---|
| **NAMONEH KANDE** | * | |
| **Plaintiff,** | * | |
| | * | **Case No.: GJH-18-2306** |
| **v.** | * | |
| **DIMENSIONS HEALTH** | * | |
| **CORPORATION,** *et al.* | * | |
| **Defendants.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

Plaintiff Namoneh Kande brought this action against Defendants Dimensions Health Corporation D/B/A Dimensions Healthcare System, Prince George's Hospital Center, and University of Maryland Medical System Corporation (collectively, "Dimensions") alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et. seq., as amended ("ADA"). ECF No. 19. Specifically, Plaintiff alleges Defendants failed to accommodate her request for a reasonable accommodation ("Count I") and discriminated against her on the basis of her disability ("Count II"). *Id.* Now pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 68, and Plaintiff's Motion for Leave to File Excess Pages in Opposition to Summary Judgment, ECF No. 69. No hearing is necessary. Loc. R. 105.6 (D. Md. 2018). For the following reasons, Plaintiff's Motion for Leave is granted, and Defendants' Motion for Summary Judgment is granted, in part, and denied, in part.

## I.    BACKGROUND[1]

On June 23, 2014, Plaintiff began working for Defendants as a contractor in the Health

Information ("HIM") Department.[2] ECF No. 68-6 at 1. On August 2, 2015, she began a full-time

position as the Electronic Medical Records ("EMR") Data Analyst. *Id*. At some time later, Akeia

Bolden was hired as the Corporate Health Information Management Operations Manager for the

HIM Department and became Plaintiff's direct supervisor. ECF No. 68-8 at 2–5; ECF No. 70-3

at 6, 17. As the department's director, Stephanie Jordan Venson also supervised Plaintiff's work.

ECF No. 68-8 at 6.

As the EMR Data Analyst, Plaintiff's responsibilities included quality management of

documents in electronic format; monitoring specific data queues and data mining to assure 100%

of all records were completely processed for coding, billing and patient care; training and

assisting doctors and others who needed to use the Electronic Medical Record system; training

clinical and ancillary staff to use the Dragon/Nuance Speech Dictation system; assisting in the

resolution of integration issues with system vendors or electronic medical record viewers; and

other tasks. ECF No. 68-7 at 62–63. Plaintiff was able to perform at least some of those tasks

from home and did so on several occasions outside of work hours and on a day that Plaintiff was

unable to come to the hospital due to snow. ECF No. 70-21 at 3–4; ECF No. 70-6 at 5. Plaintiff

used a keychain "fob" that gave her remote access into the hospital's system using software the

hospital installed on her personal laptop computer. ECF No. 70-6 at 5; ECF No. 70-3 at 33.

---

[1] Unless stated otherwise, the facts discussed herein are either undisputed or viewed in the light most favorable to
the Plaintiff, as the non-movant.
[2] At the time of the events at issue, Defendants were called Dimensions Healthcare System, which was comprised of
three facilities: Prince George's Hospital Center ("PGHC"), Laurel Regional Hospital, and the Bowie Health
Campus. ECF No. 68-4. In the fall of 2017, Dimensions became affiliated with the University of Maryland Medical
System, and the health care system was rebranded as the University of Maryland Capital Region Health. ECF No.
68-5.

In December 2015, Plaintiff learned that she was six weeks pregnant. ECF No. 68-7 at 26. In or around March 2016, Plaintiff told Ms. Bolden that she was pregnant. *Id.* at 23–25. On April 14, 2016, approximately six months into her pregnancy, Plaintiff was admitted to Howard County General Hospital for excessive vaginal bleeding and cramping. ECF No. 71-1 at 6. Plaintiff was discharged on April 16, 2016, ECF No. 68-10 at 10–11, and was diagnosed with a "low lying placenta" and a "marginal cord insertion," ECF No. 68-10 at 13. On April 19, 2016, Plaintiff saw her OB/GYN, Dr. Paul Rogers. ECF No. 70-3 at 20. During the appointment, Dr. Rogers encouraged Plaintiff to rest at home and limit her activity. ECF No. 68-7 at 30–31. However, Plaintiff told him she could not afford to take time off from work and instead suggested working two to three days a week from home. *Id.* at 33–34. Dr. Rogers provided Plaintiff with a note to give to her employer that stated:

> Namoneh Kande is an obstetrical patient currently under my professional care. Her estimated due date is 7/23/2016. Namoneh is 25 weeks with vaginal bleeding. She has a posterior/interior possible bilobed placenta that is low lying. The patient has a history of large second trimester bleed. I have advised Namoneh to rest at home and limited [sic] activity for the remainder of the pregnancy.

ECF No. 70-14.

Plaintiff provided the note to both Ms. Bolden and Ms. Jordan Venson as well as to Employee Health, *see* ECF No. 70-6 at 8; ECF No. 70-15 at 7; ECF No. 70-3 at 27–28, and asked Ms. Bolden and Ms. Jordan Venson for permission to work from home two to three days a week as an accommodation for the complications with her pregnancy. ECF No. 70-3 at 30–31. Ms. Jordan Venson told Plaintiff to put her request in writing and that she would talk to Lisa Goodlet, the CFO, about giving Plaintiff remote privileges. *Id.* at 27–28, 36. Plaintiff complied by putting her request in writing and providing it to Ms. Jordan Venson. *Id.* at 28. There is some dispute, however, regarding whether this was interpreted as a request for accommodation or a

3

telework request unconnected to a disability. *See* ECF No. 70-16 at 8; ECF No. 70-6 at 11–12. Plaintiff further testified that she met with Joanne Becon Murray, Benefits Analyst in HR, regarding her request for accommodation, who told her she would need Ms. Jordan Venson's approval. ECF No. 70-3 at 36, 48–49.

On May 6, 2016, Plaintiff submitted a request to the Human Resources Department for FMLA leave due to her pregnancy. ECF No. 68-11 at 6–10. The request, completed and signed by Dr. Rogers, sought permission for Plaintiff to work from home two to three days a week for the duration of her pregnancy. *Id.* at 8–9. Dr. Rogers again provided details of her condition to support the request, including that Plaintiff had been "admitted to Howard Co. Hospital for hemorrhage @ 24 weeks – low lying placenta but not previa." *Id.* at 8. Dr. Rogers filled out the form after he learned that Defendants had failed to grant Plaintiff's earlier telework request. ECF No. 70-3 at 24–25. It is unclear from the record who received the note, but Ms. Jordan Venson testified that if she had seen that form, Plaintiff "would have been home." ECF No. 70-15 at 10. Ms. Jordan Venson also claimed that she did not understand interactions with Plaintiff regarding her desire to telework to be requests for reasonable accommodation based on complications related to her pregnancy. *Id.*

Plaintiff alleges that Ms. Jordan Venson requested a list of her duties during a meeting concerning her request on May 11, 2016, and that she provided it but heard nothing back from either Ms. Jordan Venson or Ms. Bolden afterward despite following up with them repeatedly. ECF No. 70-3 at 32–33. Ms. Jordan Venson, Ms. Bolden, and Defendants' corporate designee testified that Plaintiff failed to provide requested information but that they continued to work to determine whether Plaintiff's responsibilities could be conducted remotely. ECF No. 70-6 at 8–10; ECF No. 68-8 at 22–26; ECF No. 70-2 at 6–7; *see also* ECF No. 68-12 at 6.

On June 11, 2016, a Saturday, Plaintiff was at the hospital making up hours she had missed due to doctor's appointments in order to avoid using Paid Time Off for those visits. ECF No. 70-3 at 37–39. While at work, Plaintiff began bleeding profusely and had to be rushed to Anne Arundel Hospital, where she was told she had suffered an abruption. *Id.* at 38–39; *see also* ECF No. 71-2 at 2; ECF No. 71-3 at 10. On June 17, 2016, she returned to the hospital due to further bleeding. ECF No. 71-4 at 3. On June 20, 2016, she was put on bed rest. ECF No. 71-2 at 2; ECF No. 70-3 at 51. Plaintiff's FMLA leave began on June 20, 2016. ECF No. 68-11 at 11. She gave birth on June 30, 2016, three weeks before her estimated due date. ECF No. 71-3 at 10; ECF No. 71-2 at 2; ECF No. 68-11 at 8.

Although Plaintiff's leave was scheduled to end on September 20, 2016, Plaintiff chose to return to work three weeks earlier than expected, on September 6, 2016. ECF No. 68-11 at 3–4. Plaintiff returned to the HIM Department and resumed her duties as the EMR Data Analyst. ECF No. 70-3 at 41. Ms. Bolden, who was nine months pregnant, was preparing to begin her own maternity leave. *Id.* Plaintiff learned that Ms. Bolden had been approved to work from home for a week before going out on maternity leave and filed a complaint with Human Resources, claiming that Ms. Jordan Venson had shown favoritism toward Ms. Bolden. ECF No. 70-2 at 9; ECF No. 70-27; ECF No. 68-8 at 35–39; ECF No. 70-6 at 19–20. Ms. Bolden's permission to work from home was revoked, and Defendants provided Plaintiff with 144 hours of paid time off credit. ECF No. 70-31; ECF No. 70-16 at 14; ECF No. 68-15 at 8–10; ECF No. 70-20 at 10; ECF No. 70-2 at 11.

On July 27, 2018, Plaintiff filed her Complaint against Defendants in this Court. ECF No. 1. Plaintiff filed an Amended Complaint on April 9, 2020. ECF No. 19. On August 10, 2020,

Defendants moved for summary judgment. ECF No. 68. Plaintiff filed a response, ECF No. 70, and Defendants replied, ECF No. 72.

## II.      STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255.

### III.    DISCUSSION

#### A.   Count I – Failure to Accommodate

In Count I, Plaintiff alleges Defendants denied her request for a reasonable accommodation in violation of the ADA when they would not permit her to work from home two to three days per week. ECF No. 19 ¶¶ 35–50. In a failure-to-accommodate case brought under the ADA, a plaintiff establishes a prima facie case by demonstrating "(1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of [her] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of the position; and (4) that the [employer] refused to make such accommodations." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)). Defendants argue that Plaintiff has not sufficiently established the first, third, and fourth elements. The Court will address each in turn.

#### 1.   Disability

Defendants first argue that Plaintiff's claim fails because she has not shown that she had a disability under the ADA. A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1); *see also Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 239 (4th Cir. 2016).

The question of whether a plaintiff is disabled or has a record of disability under the ADA is "a question of law for the court." *Rose v. Home Depot U.S.A., Inc.*, 186 F. Supp. 2d 595, 608 (D. Md. 2002)), *aff'd*, 703 F. App'x 211 (4th Cir. 2017) (quoting *Hooven–Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001)). To resolve this question, the court must make an "an

individualized inquiry, particular to the facts of each case." *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001).

Defendants argue that Plaintiff's pregnancy complications do not constitute a disability under the ADA. ECF No. 68-2 at 17–21. As Defendants note, the Fourth Circuit has not decided whether pregnancy complications can constitute disabilities under the ADA. However, other courts have consistently found that, while pregnancy alone is insufficient to state a claim under the ADA, complications related to pregnancy may be found to be impairments that substantially limit a major life activity such that they constitute disabilities. *See, e.g.*, *Penaloza v. Target Corp.*, 549 F. App'x 844, 848 n.2 (11th Cir. 2013) ("Pregnancy is generally not considered a disability, although a pregnancy-related impairment may be considered a disability if it substantially limits a major life activity."); *Darian v. Univ. Mass. Boston*, 980 F. Supp. 77, 85 (D. Mass. 1997) ("By its terms, though pregnancy per se is not covered by the ADA, the Act does not necessarily exclude all pregnancy-related conditions and complications."); *Cerrato v. Durham*, 941 F. Supp. 388, 392 (S.D.N.Y. 1996) ("[C]ourts have distinguished between a normal, uncomplicated pregnancy itself and a complication or condition arising out of the pregnancy and have found that, under particular circumstances, the pregnancy-related condition can constitute a 'disability' within the meaning of the ADA[.]"). Indeed, in guidelines promulgated following the passage of the ADA Amendments Act of 2008 ("ADAAA"), which expanded the scope of disability coverage,[3] the Equal Employment Opportunity Commission noted that "[a]lthough pregnancy itself is not an impairment within the meaning of the ADA, and thus is never on its own a disability, some pregnant workers may have impairments related to their pregnancies that qualify as disabilities under the ADA, as amended." U.S. EQUAL EMP.

---

[3] *See, e.g.*, *Johnson v. Baltimore City Police Dep't*, No. CIV.A. ELH-12-2519, 2014 WL 1281602, at *14 (D. Md. Mar. 27, 2014) (discussing the ADAAA's revisions and broader scope).

OPPORTUNITY COMM'N, EEOC-CVG-2015-1, ENFORCEMENT GUIDE: PREGNANCY DISCRIMINATION AND RELATED ISSUES (2015). Therefore, while pregnancy itself is not a disability, Plaintiff can state a claim under the ADA if she can show her associated complications are impairments that substantially limited major life activities. Ultimately, the key inquiry is "the nature of the disability, regardless of its origin"—pregnancy or otherwise. *Darian*, 980 F. Supp. at 86.

The Court therefore turns to the question of whether, in this case, Plaintiff's complications constituted an ADA disability. In making this determination, courts first consider whether the complications were normal or abnormal in the context of pregnancy; only abnormal complications may qualify as impairments under the ADA. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 397 (6th Cir. 2010); *Gabriel v. City of Chicago*, 9 F. Supp. 2d 974, 980 (N.D. Ill. 1998); *see also, e.g.*, *Serednyj v. Beverly Healthcare LLC*, No. 2:08–CV–4 RM, 2010 WL 1568606, at * 14 (N.D. Ind. Apr. 16, 2010) (surveying cases and noting that "only abnormal complications might qualify as impairments" under the ADA); *Mayorga v. Alorica, Inc.*, No. 12-21578-CIV, 2012 WL 3043021, at *5 (S.D. Fla. July 25, 2012) ("[W]here a medical condition arises out of a pregnancy and causes an impairment separate from the symptoms associated with a healthy pregnancy, or significantly intensifies the symptoms associated with a healthy pregnancy, such medical condition may fall within the ADA's definition of a disability.").

Here, Plaintiff has shown that she had (1) vaginal bleeding; (2) posterior/interior possible bilobed placenta that was low lying;[4] and (3) a history of large second trimester bleeding. ECF No. 68-11 at 16. Medical records also show Plaintiff was diagnosed with a marginal cord

---

[4] Dr. Rogers testified that a placenta is "low lying" when it is "within a centimeter to the opening of the cervix," increasing the chance of a separation, or abruption. ECF No. 71-3 at 6. ("In other words, it's not up high where it's supposed to be into the uterus.").

insertion,[5] that she was of advanced maternal age, and that she was taken to the emergency room at Howard County General Hospital for hemorrhage at 24 weeks. ECF No. 71-1 at 4–5; ECF No. 71-2 at 2. These conditions increased the chances of an abruption, where the placenta detaches from the cervix, which could be fatal to the fetus. ECF No. 71-3 at 4–5. As a result of these complications, her doctor told her she needed to limit her activity. ECF No. 68-7 at 30–31. Given these facts, the Court concludes that Plaintiff's complications are not those experienced in a normal pregnancy, and they constitute an impairment.[6] *See Serednyj v. Beverly Healthcare LLC*, No. 2:08-CV-4 RM, 2010 WL 1568606, at *15 (N.D. Ind. Apr. 16, 2010), *aff'd*, 656 F.3d 540 (7th Cir. 2011) (finding spotting, cramping, low progesterone levels, and risk of miscarriage to be physical impairments and relying on doctor's notes establishing that the plaintiff's condition was serious, that she risked losing her pregnancy, and that she required bed rest for two weeks); *Cerrato v. Durham*, 941 F. Supp. 388, 393 (S.D.N.Y. 1996) (adopting the American Medical Association's Council on Scientific Affairs' conclusion that a "threatened . . . miscarriage" is a "substantial complication" not part of an "entirely normal, healthy pregnancy"); *cf. Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 490 (D. Md. 2013) (finding the plaintiff's severe morning sickness was not a disability where the plaintiff testified that the emergency room physician "just thought that [she] needed to regulate the potassium" and "other than that, he didn't think it was a big deal").

---

[5] Dr. Rogers testified that a marginal cord insertion is where the umbilical cord, rather than being "centrally located," is "inserted on the edge of the placenta." ECF No. 71-3 at 5. This creates a risk for the patient, as increased pressure on that marginal cord insertion could cause the placenta to separate from the uterus. *Id.* at 5– 6 ("If you put something in the middle and it's soft and mushy and you put pressure on it, it spreads it out more. If you put it on the edge where there's no place to absorb all that trauma or that pressure from when pressure increases due to the blood pumping through the cord, when there is not a good connection, there could be a bleed from that area.").

[6] Dr. Rogers acknowledged that "everybody has a potential, a 1 to 2 percent risk of abruption of the placenta." ECF No. 71-3 at 4. However, the fact that a small chance of an abruption exists for the general population does not render Plaintiff's heightened chance of an abruption based on her complications "normal."

Having found Plaintiff's complications constituted an impairment, the Court next considers whether that impairment substantially limited her major life activities.[7] Congress stated that its intent in passing the ADAAA included "convey[ing] that the question of whether an individual's impairment is a disability under the ADA should not require extensive analysis" and that the then-existing standard that courts applied to the term "substantially limits" had "created an inappropriately high level of limitation necessary to obtain coverage under the ADA." *See* Pub. L. 110–325, 122 Stat. 3553, § 2(b)(5). Thus, the relevant regulations now provide that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1)(i). Although prior to the ADA's amendment, "courts also considered factors such as 'the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment,'" the Fourth Circuit has since found those standards "outdated." *Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 875 (4th Cir. 2020) (internal citation omitted). Moreover, as amended, the ADA provides that "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section." 29 C.F.R. § 1630.2(j)(1)(ix); *see also Miller*, 813 F. App'x at 875 ("There is no requirement that an actual disability be long lasting or severe.").

Ultimately, "for a major life activity to be 'substantially limit[ed],' the impairment need only 'substantially limit[] the ability of an individual to perform a major life activity as compared

---

[7] As the parties discuss, there is disagreement regarding the question of whether the determination of whether pregnancy complications substantially limit a plaintiff's major life activity is a question of law for the Court or fact for the jury. *See, e.g.*, *Hogan v. Ogden*, No. CV-06-5078-EFS, 2008 WL 2954245, at *5 (E.D. Wash. July 30, 2008); *Hamilton v. Prince George's Cty., Maryland*, No. CV DKC 17-2300, 2019 WL 4735429, at *11 (D. Md. Sept. 27, 2019) (quoting *Rose v. Home Depot U.S.A., Inc.*, 186 F. Supp. 2d 595, 608 (D. Md. 2002)). The Court need not resolve that question at this juncture and determines that, at the very least, Plaintiff has established a genuine dispute of fact that defeats summary judgment.

to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Miller*, 813 Fed. App'x. at 875 (quoting 29 C.F.R. § 1630.2(j)(1)(ii). Major life activities include, but are not limited to, "sleeping, walking, standing, lifting, bending . . . working" and the operation of "reproductive functions." 42 U.S.C. § 12102(2)(A)–(B).

As discussed above, Dr. Rogers testified that a low-lying placenta and a marginal cord insertion contribute to an increased risk of abruption. ECF No. 71-3 at 5. Dr. Rogers testified that he does not "ever try to put people at complete bed rest" due to the risk of blood clots. *Id.* at 7. However, he believed that in Plaintiff's case, that an intermediate step, resting at home, was "medically required" given her complications.[8] *Id.* at 11–12. Dr. Rogers further specified that decreased activity was necessary to avoid increasing abdominal pressure and triggering an abruption. *Id.* at 8. Finally, since Plaintiff's due date was July 23, 2016, and Dr. Rogers recommended she limit her activity for the duration of her pregnancy, the duration of the disability was approximately three months. *See* ECF No. 70-14.

Given the medical records, testimony from Dr. Rogers, and testimony from Plaintiff regarding the risks Plaintiff faced as a result of her pregnancy complications and the limitations on her life activities, the Court finds Plaintiff has sufficiently established that her impairment substantially limited major life activities and therefore that she was disabled under the ADA. *See Soodman v. Wildman, Harrold, Allen & Dixon*, No. 95 C 3834, 1997 WL 106257, at *6 (N.D. Ill. Feb. 10, 1997) (holding that "the inability or significantly impaired ability to carry a viable fetus to term is . . . a 'substantial impairment'" under the ADA); *see also Darian v. Univ. Mass.*

---

[8] Dr. Rogers testified that by "resting at home," he meant "stay at home, stay at rest, don't go shopping, don't go out and buzz around carrying groceries and stuff." ECF No. 71-3 at 7. This also meant for patients "[n]ot to leave [their] home] unless they have to go someplace like a doctor's appointment or something like that." *Id.*

*Boston*, 980 F.Supp. 77, 85 (D. Mass. 1997) (finding at summary judgment stage that late-term severe pain and paralyzing uterine contractions constituted a disability under the ADA); *McKellips v. Franciscan Health Sys.*, No. C13-5096MJP, 2013 WL 1991103, at *4 (W.D. Wash. May 13, 2013) (finding an ADA claim was not futile where Plaintiff alleges she suffered severe pelvic inflammation and immobilizing pain, and a doctor's note advised her to take maternity leave two months early and to seek accommodations at work).

Defendants rely on *Brockman v. Snow*, 217 F. App'x 201, 209 (4th Cir. 2007) to argue that her complications did not meet the definition of a disability. But *Brockman* is inapposite for two reasons. First, *Brockman* was decided prior to the amendment of the ADA, which broadened the definition of a disability. Second, the *Brockman* decision, finding that pregnancy complications did not leave the plaintiff disabled, rested on the fact that no evidence of the duration of her disability, nor of its severity, was provided. *Id*. Here, Plaintiff has introduced evidence from her doctor indicating in detail the heightened possibility that she would suffer an abruption without decreased activity and that she needed to work from home two to three days per week for the remainder of her pregnancy.

*Jeudy v. Holder*, also cited by Defendants, is likewise distinguishable. No. 10-22873-CIV, 2011 WL 5361076, at *6 (S.D. Fla. Nov. 7, 2011). There, the court determined that the plaintiff's testimony and doctor's note indicating that she experienced pain and should not repetitively walk upstairs did not create a factual dispute as to whether her impairment substantially limited a major life activity. *Id*. Here, again, Plaintiff has provided evidence suggesting that without a reduction in activity she risked an abruption and the potential loss of her child.

Finally, Defendants' argument that "Plaintiff's actual performance of her job after requesting to work from home belies any assertion that she was in fact substantially limited in a major life activity" fails. ECF No. 68-2 at 21.[9] First, this is decidedly contradicted by the record. Plaintiff suffered an abruption while at work on June 11 that required her to go on full bed rest, and she ultimately delivered her baby three weeks before her estimated due date. ECF No. 70-3 at 37–39; ECF No. 71-3 at 10; ECF No. 71-2 at 2; ECF No. 68-11 at 8. Thus, Plaintiff most certainly did not work "without issue." *Cf.* ECF No. 68-2 at 25. Second, Defendants' implicit argument—that a plaintiff's continued work without a negative health event means that they are not substantially limited—is unworkable with respect to conditions that do not arise continuously, such as a hearing impairment, but instead involve the need to avoid a potentially catastrophic injury or event—in this case, an abruption. Taking into account whether a plaintiff actually worked without incident after the denial of an accommodation would allow defendants to deny coverage to employees and avoid liability so long as the employees continued to work and did not actually suffer the health consequences for which they are at risk. This cannot be the law.

## 2.   Reasonable Accommodations to Perform Essential Functions

Defendants also dispute the third element of Plaintiff's claim: that she could have performed the essential functions of her job with a reasonable accommodation. "Plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation." *Tyndall v. Nat'l Educ. Centers, Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994); *see also Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012). Under the ADA, essential functions are those "that bear more than a marginal relationship

---

[9] Defendants further state that Plaintiff "worked on-site without issue for 1.5 months after this request until she took leave to give birth." ECF No. 68-2 at 25.

to the job at issue." *Tyndall*, 31 F.3d at 213 (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir. 1993)); *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 579–80 (4th Cir. 2015). A reasonable accommodation is one that "enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position." 29 C.F.R. § 1630.2(o)(1)(ii). Reasonable accommodations may comprise "job restructuring, part-time or modified work schedules," 42 U.S.C. § 12111(9)(B), as well as "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment," 29 C.F.R. § app. 1630.2(o).

Defendants set out three arguments for the proposition that Plaintiff does not meet the third element of her failure-to-accommodate claims: (1) that she requested to work from home because of her commute, which is not an essential function of her job and does not need to be accommodated; (2) her requested work-from-home accommodation was not medically necessary, and thus was not reasonable; and (3) Plaintiff could not perform the essential functions of her positions from home. ECF No. 68-2 at 22. The Court will address each argument in turn.

### a. Workplace Barriers to Performance of Essential Functions

"Although an employer is required to make reasonable accommodations to eliminate barriers for a disabled employee in the workplace, the employer is not required to eliminate barriers outside the workplace that make it more difficult for the employee to get to and from work[.]" *Robinson v. Bodman*, 333 Fed. App'x 205, 208 (9th Cir. 2009). Citing *Robinson*, Defendants argue that they were not required to accommodate Plaintiff by eliminating her commute because her commute was a barrier outside of her workplace and not an essential function of her job. This mischaracterizes Plaintiff's claim.

15

Plaintiff requested an accommodation due to her need to "rest at home" and "limit activity" in accordance with her doctor's advice, not due to the sole issue of driving. *See* ECF No. 70-14. This is evident not only from the doctor's note, *see id.*, but also from Dr. Rogers' and Plaintiff's testimony. Dr. Rogers testified that by "rest at home," he meant "stay at home, don't do anything, heavy lifting, pushing, pulling, be normal as you can, and call me if you have any issues," and that by "limited activity" he meant "[n]o sex, no vacuuming, no doing -- carrying groceries, no going shopping, no going outside to the store, let her husband do all of that." ECF No. 71-3 at 8. Plaintiff testified that she was told to get "pelvic rest," which meant "no sexual intercourse, not lifting anything over ten pounds, not doing rigorous activities, not doing laundry, bending, you know, sitting down for long amount of time or standing or running[.]" ECF No. 68-7 at 30–31. Plaintiff further testified that "resting was a major thing, so avoiding the drive back and forth to work would alleviate some of the stress that I exert on my body." *Id.* at 38. This does not suggest that Plaintiff believed her only barrier to working was her commute, but instead that avoiding driving was one component of the broader need to rest.

Defendants further assert that Plaintiff "testified that she could comply with her doctor's recommendation to rest while in her work environment," ECF No. 68-2 at 24, citing to testimony in which Plaintiff said she could elevate her feet, as her doctor had recommended, while at work, ECF No. 68-2 at 36. But the fact that Plaintiff could partially eliminate a barrier while at work does not mean that her request to work from home was unnecessary or unreasonable. As is evident in Dr. Rogers' testimony, his recommendation that she rest extended beyond elevating her feet. Therefore, the Court finds there is, at least, a genuine dispute of material fact raised by Plaintiff regarding whether Plaintiff requested an accommodation due to barriers in the workplace that Defendants were obligated to address.

16

### b. Medical Necessity of Accommodations

Second, Defendants argue that her requested work-from-home accommodation was not medically necessary, and thus was not reasonable. ECF No. 68-2 at 24. The ADA does not require employers to defer to employee preference and only requires accommodations that are necessary and causally related to the disability. *See Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1182–83 (8th Cir. 2019), *reh'g denied* (Mar. 21, 2019) (finding an employee's assertion that it "would have been easier" to work from home does not require an accommodation, as an "employer is not required to accommodate an employee based on the employee's preference"); *Fierce v. Burwell*, 101 F. Supp. 3d 543, 550 (D. Md. 2015) ("[T]he denial of a request by a disabled employee could only subject the employer to liability if there is 'a causal relationship between the disability and the request for accommodation,' or, in other words, if 'the requested accommodation was necessary in order for [her] to perform the essential functions of [her] job.'") (quoting *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997)).

Taken in the light most favorable to Plaintiff, Dr. Rogers' testimony and the documentation he provided at the time sufficiently establishes that it was necessary for Plaintiff to rest at home and limit her activity due to her disability, and not a matter of mere preference. Dr. Rogers testified that he believed it was medically required that Plaintiff rest at home, ECF No. 71-3 at 11–12, and he stated in Plaintiff's FMLA paperwork, dated May 5, 2016, that it was medically necessary for Plaintiff to work from home two to three days a week and be on pelvic rest, ECF No. 70-10 at 5. Dr. Rogers also testified to the causal link between the disability and the accommodation, explaining that his recommendation of decreased activity was necessary to avoid increasing abdominal pressure and triggering an abruption. ECF No. 71-3 at 8. He further stated, "[w]e didn't want to disrupt the placenta and cause it to bleed again and to have her have

an emergency C-section at this gestational age because the baby may not -- it would not survive without significant morbidity." *Id.*

Defendants, arguing that Plaintiff's accommodation was not medically necessary, point to the fact that Dr. Rogers' note "merely indicated that Plaintiff 'should continue to work from home.'" ECF No. 68-2 at 25. Defendants differentiate between the phrases "**should** work from home" and "**must** work from home," in arguing that Dr. Rogers did not tell Plaintiff or Defendants that it was medically necessary for Plaintiff to work from home. *Id.* (emphasis Defendants'). The Court is not similarly moved by this semantic word choice given the context of his testimony.

As addressed above, the Court is also not persuaded by Defendants' argument that "Plaintiff's performance of her job after requesting to work from home demonstrates that such an accommodation was not medically necessary." ECF No. 68-2 at 25. Even were the Court to accept such post hoc analysis as persuasive, the fact that Plaintiff suffered an abruption at work would defeat it.

Finally, the Court rejects Defendants' argument that Plaintiff's request was borne out of economic rather than medical necessity. ECF No. 72 at 11 ("Plaintiff has maintained throughout the litigation that the primary reason she wanted to work from home was for financial reasons."). The facts do not support this argument. Taking the facts in the light most favorable to Plaintiff, *because she could not afford to lose her job*, she sought a compromise in which she worked only two or three days from home. ECF No. 70-3 at 21–22 ("His recommendation was, yes, to have bed rest, and I said at that point, you know, I cannot stay home on bed rest the whole entire time because of my financial situation."). In other words, it was continuing to work that Plaintiff

found financially necessary despite her doctor's recommendation that staying at home was medically necessary.

### c. Performance of Essential Functions with Accommodation

Finally, Defendants argue that Plaintiff could not perform the essential functions of her position with her proposed accommodation: working two to three days a week from home. Relevant here, a reasonable accommodation includes "modifications or adjustments to the work environment under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). As stated above, "Plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation." *Tyndall v. National Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994).

In support of her claim, Plaintiff points to evidence that she had the capacity to perform certain responsibilities from home and had in fact done so on multiple occasions. *See* ECF No. 70-3 at 14, 21–22, 33 ("[O]ver the weekend, if there's an urgent situation where the doctor needs to discharge a patient or transfer a patient and those documents are in there and they cannot transfer the patient without those notes, I will be called. And they will be, like, okay, can you push these documents through? So I will get into the system remotely and make that correction."). Ms. Bolden also testified that Plaintiff was able to perform certain tasks from home and had done so. ECF No. 70-6 at 5. Plaintiff stated that the only task she could not perform from home was a physician technical training for which she was responsible, but that she had only performed the training 10 times for 30 minutes in her entire time as an EMR Data Analyst, and that Ms. Bolden and Penny Caldwell, another coworker, were also responsible for these trainings. ECF No. 70-8 at 17–18.

Defendants cite to case law finding that permanent, full-time work from home is an acceptable accommodation only in rare circumstances. *See, e.g.*, *Davis v. Lockheed Martin Operations Support, Inc.*, 84 F. Supp. 2d 707, 713 (D. Md. 2000) (work from home accommodations are only reasonable in "the unusual case where an employee can effectively perform all work-related duties at home" because "attendance at the work site is presumed to be an essential function of a job") (quoting *Tyndall*, 31 F.3d at 213); *Broussard v. Panetta*, No. CIV. CCB-11-3401, 2013 WL 45902, at *8 (D. Md. Jan. 2, 2013) (presence at the worksite is an essential function absent unusual circumstances). But this is not a bright-line rule rejecting the notion of allowing an employee to work from home as an accommodation; rather, the issue is whether Plaintiff could have performed the essential functions of her job while working remotely two to three days a week for approximately three months. *See Dahlman v. Tenenbaum*, No. CIV.A. DKC 10-2993, 2011 WL 3511062, at *14 (D. Md. Aug. 9, 2011) (finding cases addressing full-time telework inapposite and that "[w]here employees seek only part-time telework, courts have concluded that reasonable jurors could deem this a possible accommodation"); *see, e.g., Freeman v. Chertoff*, 604 F.Supp.2d 726, 735–36 (D.N.J. 2009) (holding a reasonable jury might find that permitting the plaintiff to telework two days a week was a possible accommodation).

Defendants also correctly argue that, "[i]n order to establish the essential functions of a position, the ADA requires the Court to look at . . . [the] employer's judgment of the essential functions" and "the job description, if it was prepared prior to hire." ECF No. 68-2 at 26 (citing 42 U.S.C. § 12111(8)). However, at the summary judgment stage, the employer's judgment will not be dispositive regarding whether a function is essential when evidence on the issue is "mixed." *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012). If an employer's judgment

about what qualifies as an essential task were conclusive, "an employer that did not wish to be inconvenienced by making a reasonable accommodation could, simply by asserting that the function is 'essential,' avoid the clear congressional mandate that employers 'mak[e] reasonable accommodations.'" *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007) (alteration in original) (quoting 42 U.S.C. § 12112(b)(5)(A)). Additionally, the fact that a responsibility was listed in a job description is not dispositive of whether it was an essential function of the job, as courts will also look to the employee's actual performance of her job duties to determine which are essential. *See Gunter v. Bemis Co., Inc*., 906 F.3d 484, 489 (6th Cir. 2018); *Davidson v. Am. Online, Inc*., 337 F.3d 1179, 1191 (10th Cir. 2003) ("[A]n employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description.").

Defendants point to testimony that Ms. Bolden and Ms. Jordan Venson were unsure whether Plaintiff's essential functions could be carried out at home. ECF No. 70-6 at 8 ("I -- not sure that -- if her role would allow her to be remote."); ECF No. 68-8 at 17 ("I was transparent with her in regards to her role not being a remote role."); *id.* at 18–21 (testifying that Ms. Bolden "look[ed] into" whether paperwork could have been transmitted to Plaintiff when she was working remotely so that she could perform the quality management tasks but did not speak to anyone about it or figure out whether it was possible or not); ECF No. 70-15 at 8 ("I'm not going to say a lot, some of the work was based on people coming into the department, physicians and other persons who needed some type of training in regards to the electronic medical record. And if you're not here, then who's going to do that?"). However, this evidence does not resolve the factual disputes regarding whether Plaintiff could have performed her responsibilities on a partial work-from-home schedule. First, Ms. Bolden and Ms. Jordan Venson did not testify that she

could not have performed her work from home, only that they were uncertain whether she could. Moreover, as Defendants' corporate witness and Vice President of HR testified, her request was never denied and was still under consideration several months later, meaning that, prior to litigation, Defendants had still not made a determination regarding whether Plaintiff could perform her responsibilities remotely and whether her request was reasonable. *See* ECF No. 70-6 at 8; ECF No. 70-20 at 9 ("[B]efore the department could work through the request, the employee went out.").

Regarding Plaintiff's job description, Defendants point to five tasks that they argue could not have been performed remotely. ECF No. 72 at 11–18; *see also* ECF No. 68-7 at 62–70 (EMR Data Analyst job description). The five tasks fall into three categories—technical support, technical trainings, and quality management of data—that the Court considers in turn. First, the technical support tasks include: "[c]oordination with systems and applications among Health Information Management department and PFS, Clinicians, Information Technology Dept (IT), Patient Access and other department duties as required to resolve issues encountered" and "[t]roubleshoot printing/processing issues with ROI requests for internal and external clients." ECF No. 72 at 12, 15. Defendants assert that "[i]n describing [the first] duty, Plaintiff testified that she would troubleshoot these issues over the phone with the vendor with the problem computer in front of her,"[10] and that "Plaintiff would need to be onsite to perform these duties"

---

[10] Defendants' assertion that Plaintiff would work to resolve the problem "with the problem computer in front of her," is based on testimony in which Defendants' counsel asked Plaintiff whether, if someone was having a problem with their computer, "they would ask [her] to, say, 'Ms. Kande, can you come over and take a look? I'm having a problem'?" Plaintiff answered, "Yes. And then I would reach out to the people that I'm working with when those issues arise, like the IT, the IT Department, you know, the Help Desk, you know, and we all work together." ECF No. 70-3 at 12. The Court does not find that this testimony supports a conclusion that it was necessary that Plaintiff be able to see the computer while liaising with the Help Desk to resolve the problem.

because she could not remotely access her co-workers' computers while working from home.[11] *Id.* at 12. But Plaintiff testified that the Help Desk would remote into co-workers' computers, and that her role was to coordinate with the Help Desk and the IT Department to resolve software issues. ECF No. 70-3 at 12. Plaintiff also testified that she conducts most of her work coordinating technical support by phone. *Id.* at 11 ("If it's a major issue, yes, [the vendors] will come onsite, yes, but most of the time they will direct me over the phone."). Regarding the second technical support duty, "[t]roubleshoot[ing] printing/processing issues," Plaintiff testified that "there were times where we upgraded our printers, and we had to change the whole printing system, and I would make sure the printers are working correctly." *Id.* at 15. She further testified that she would attempt to resolve the problem and would call the Help Desk for support if she was unable to resolve it alone. *Id.* Additionally, Plaintiff's states that "[l]iais[ing] between medical staff and IT department regarding printing issues" was a task she recalled performing remotely. ECF No. 70-8 at 17. Taking these facts in the light most favorable to Plaintiff, the Court finds a reasonable juror could conclude that Plaintiff's role consisted primarily of coordination between various entities to resolve technical issues, that this work could be done largely by phone, and that whatever work she needed to do in person could be performed on the two or three days a week that she was in the office.

Second, Plaintiff was responsible for "[q]uality management of documents in electronic format" and "working closely with Patient Access Dept., and Patient Financial Services (PFS) to analyze and provide solutions for duplicates or other inaccuracies in the electronic patient database." ECF No. 72 at 16–17. Both of these responsibilities appear to have consisted of

---

[11] The Court notes that Plaintiff was discussing a separate duty in that portion of her testimony: "[c]orrect and assist in the resolution of integration issues with system vendors 4 or EMR viewers." ECF No. 70-3 at 11–12. Nevertheless, it still falls within the category of technical support, so the Court considers the testimony here.

checking for errors in the data entry systems to assure records were properly processed for coding, billing and patient care and coordinating with the physicians or other staff members to correct any issues.[12] Although Plaintiff testified that she would perform this work in person when she was at the hospital, ECF No. 70-3 at 11, 14, she also said that she had performed the first task remotely (faxing the documents that required correction to the doctors and discussing them by phone), *id.* at 46–47, and that she could have done the same for the second task, *id.* at 45. Thus, a reasonable juror could conclude that Plaintiff could perform these tasks remotely.

Third, Defendants argue that Plaintiff needed to be onsite in order to "[t]rain[] and assist[] doctors and others who need to use Electronic Medical Record system to include application training, reviewing system and completing the record (i.e. message center, electronically signing of documents)." ECF No. 72 at 13. Plaintiff's interrogatory response states that this was the only task that needed to be conducted in person, but that it was a shared responsibility among Plaintiff, Ms. Bolden, and their coworker Penny Caldwell, and that Plaintiff estimates she only conducted approximately ten of these thirty-minute physician trainings in her entire time as an EMR Data Analyst. ECF No. 70-8 at 17–18. Ms. Caldwell also testified that when Plaintiff was absent, she would conduct the trainings. ECF No. 70-7 at 4 ("So it wasn't a primary duty for myself; however, in the interest of coverage or assistance if we had a high number of physicians needing assistance, and/or that person was not in the office, then I would provide assistance or coverage for those tasks."). While it is true that reassignment of essential functions is not required under the ADA, the Court finds there to be a dispute of material fact

---

[12] Plaintiff testified, regarding the first of the two tasks, "I make sure that whatever is in the system electronically, which is the electronic medical records, as far as documentation from all clinicians or doctors or specialists, I, when I get all that information in the system, I review those documents and make sure the documents are error-free, they are correct, they are, they have the correct number to it for transcription purposes, and make sure they live where they are supposed to be living. So, for instance, if the doctor has, like, a consult note or a discharge note, it's supposed to be in a specific category so that, when a clinician or a specialist goes in to review those notes, they could easily find it and it must be error-free, you know, and correct." ECF No. 70-3 at 7.

regarding whether the physician trainings were essential functions of Plaintiff's position that could not have been reasonably accommodated by a partial remote work arrangement. *See Benson v. Nw. Airlines, Inc*., 62 F.3d 1108, 1112 (8th Cir. 1995) ("Job restructuring is a possible accommodation under the ADA. Restructuring frequently involves reallocating the marginal functions of a job.") (internal citations omitted); *Rorrer v. City of Stow*, 743 F.3d 1025, 1044 (6th Cir. 2014) ("Shifting marginal duties to other employees who can easily perform them is a reasonable accommodation."); *see also EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, No. 915.002 (Oct. 17, 2002) ("An employer may switch the marginal functions of two (or more) employees in order to restructure a job as a reasonable accommodation."); *cf. Rehrs v. Iams Co.*, 486 F.3d 353, 357 (8th Cir. 2007) ("[A]n accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated."); *accord Milton v. Scrivner, Inc*., 53 F.3d 1118, 1125 (10th Cir. 1995). Taking the facts in the light most favorable to Plaintiff, the physician trainings were a shared responsibility performed rarely. Therefore, although Plaintiff concedes that the trainings for which she was responsible were conducted in person, a reasonable juror could conclude that they were not essential functions of her job or that, if they were, Plaintiff was not required to be present in the office all five days a week in order to conduct them, such that her proposed accommodation was unreasonable.

Plaintiff has shown sufficient evidence to establish that she could perform the essential functions of her position with a reasonable accommodation. Additionally, based on the same evidence, her proposed accommodation was reasonable on its face. *Halpern v. Wake Forest Univ. Health Services*, 669 F.3d 454, 464 (4th Cir. 2012) (holding that plaintiff must "present

evidence from which a jury may infer that the accommodation is 'reasonable on its face'")
(internal citation omitted). Therefore, summary judgment is not appropriate on this question.

### 3.   Refusal to Make Accommodations

Defendants argue that Plaintiff failed to establish the fourth element of her failure-to-

accommodate claim because Defendants offered her a reasonable accommodation that she

rejected. ECF No. 68-2 at 28–29. "If an employee rejects a reasonable accommodation, the

individual is no longer considered a 'qualified individual with a disability.'" *Talley v. Family

Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1108 (6th Cir. 2008); *see also Andrew v. Com. Of

Va*., 2000 WL 1532333, at *1 (4th Cir. 2000) (finding that the accommodations offered to the

plaintiff were reasonable, and thus her rejection of the proposed accommodations removed her

from the category of "qualified individuals with a disability"). Defendants rely on deposition

testimony from Ms. Bolden to assert that they offered Plaintiff a reasonable accommodation:

working from the Laurel campus. ECF No. 70-6 at 13. Plaintiff claims that she was not offered

an alternative accommodation. ECF No. 70-3 at 48 ("Q: Did anyone else at Dimensions have

that sort of conversation with you, while we can't give you telework, we can maybe offer you

this or what other things might you need? A: No. Nothing at all."). Additionally, this proposed

accommodation would not address Plaintiff's need to rest at home. The Court finds there to be a

material dispute of fact on the question and will not award summary judgment on this basis.

### B.   Count II – Disability Discrimination

Having determined that disputes of material facts preclude summary judgment on Count

I, the Court proceeds to assess Defendants' arguments that Plaintiff has failed to establish she

was subject to discrimination on the basis of her disability. Specifically, Plaintiff claims she

received less favorable treatment than Ms. Bolden did when she was allowed to work from home

during her pregnancy. *See* ECF No. 19 ¶¶ 51–57. In order to prove a claim for disparate treatment discrimination under the ADA, Plaintiff must show "(1) [s]he is a member of a protected class; (2) [s]he has satisfactory job performance; (3) [s]he was subjected to adverse employment action; and (4) similarly situated employees outside [her] class received more favorable treatment."[13] *Lipscomb v. Techs., Servs., & Info., Inc*., Civil No. DKC-09-3344, 2011 WL 691605, at *12 (D. Md. Feb. 18, 2011) (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007)).

Plaintiff has failed to establish that a similarly situated employee outside her class received more favorable treatment. The Court notes that job titles alone are not dispositive on the question of being similarly situated. *See Bateman v. American Airlines, Inc.*, 614 F. Supp. 2d 660, 674 (E.D. Va. 2009). "The key inquiry is whether the positions are similar in the respects that are relevant to the alleged disparate treatment." *Id.* Here, the relevant points of comparison were their job responsibilities and ability to conduct those responsibilities remotely. Treating employees with different job responsibilities differently with respect to their telework requests will not raise a reasonable inference of unlawful discrimination. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc*., 53 F.3d 55, 58 (4th Cir. 1995), as amended (June 9, 1995), as amended (Mar. 14, 2008). Plaintiff and Ms. Bolden held different positions, and Plaintiff has not shown that she and Ms. Bolden had similar job responsibilities—Plaintiff states that the two had the "same capability to work from home," but does not support that assertion with evidence in the

---

[13] The fourth element has alternatively been stated as "her [adverse employment action] occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc*., 53 F.3d 55, 58 (4th Cir. 1995), as amended (June 9, 1995), as amended (Mar. 14, 2008). Ultimately, the fourth prong "require[s] that the plaintiff present some other affirmative evidence that disability was a determining factor in the employer's decision." *Id.* at 59. Here, Plaintiff has not made a showing allowing for the inference that her pregnancy complications were causally related to Defendants' failure to accommodate her request.

record. ECF No. 70 at 47. Accordingly, the Court finds that Plaintiff's disparate treatment claim fails based on the failure to satisfy the fourth element of the prima facie case.

While the facts show Plaintiff and Ms. Bolden were treated differently, they do not show the particular kind of disparate treatment that may be remedied under the ADA. Accordingly, Defendants' Motion for Summary Judgment is granted with respect to Count II.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Leave is granted, and Defendants' Motion for Summary Judgment is granted, in part, and denied, in part. A separate Order follows.

Dated: <u>December 2, 2020</u>                    /s/_____

                                                                      GEORGE J. HAZEL
                                                                      United States District Judge